UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LABORERS' PENSION FUND, and LABORERS' WELFARE FUND OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, and LABORERS' DISTRICT COUNCIL RETIREE HEALTH AND WELFARE FUND, and CATHERINE WENSKUS, Administrator of the Funds, and THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, Plaintiffs, v. MURPHY PAVING AND SEALCOATING, INC., an Illinois corporation, and MICHAEL MURPHY, individually, Defendants. | No. 16 C 8043<br><br>Judge Rebecca R. Pallmeyer |

**MEMORANDUM ORDER AND OPINION**

Defendant Murphy Paving and Sealcoating, Inc. and Plaintiff Construction and General Laborers' District Council of Chicago and Vicinity ("District Council") are parties to a collective-bargaining agreement that the District Council contends Murphy Paving has repeatedly violated. In this lawsuit, the District Council and associated benefit funds—the Laborers' Pension Fund, the Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and the Laborers' District Council Retiree Health and Welfare Fund (collectively "the Funds")—seek to collect unpaid wages, employee benefit contributions, and union dues from Murphy Paving. (*See* Am. Compl. [76].) Murphy Paving responded with this counterclaim [81]. Murphy alleges that the District Council and the Funds tortiously interfered with its contracts and business expectancy by notifying some of the general contractors for which Murphy Paving planned to perform paving and maintenance

1

work that Murphy Paving was not complying with the terms of its collective-bargaining agreement. The District Council and the Funds move to dismiss the counterclaim in its entirety as preempted by either Section 301 of the Labor Management Relations Act ("LMRA"), *see* 29 U.S.C. § 185, or by other federal labor laws. For the reasons stated below, the motion to dismiss [96] is granted.

## **BACKGROUND**

Murphy Paving and the District Council, a labor organization, executed a collective-bargaining agreement ("CBA") that was effective at all times relevant to this dispute. (Countercl. [81] ¶ 6.) Murphy Paving also signed a Side Letter of Agreement ("Side Letter") granting it certain exceptions from the CBA's terms. According to the allegations in the counterclaim, deemed true for purposes of this motion, Murphy Paving has fully complied with the agreement's wage, fringe benefit, and dues requirements. (*Id.* ¶ 7.) The District Council has nonetheless filed a series of grievances against Murphy Paving alleging violations of the CBA and the Side Letter.

The District Council and affiliated local unions first filed two grievances against Murphy Paving in November 2015, alleging based on audits that Murphy Paving underpaid wages, fringe benefits, and union dues between January 2013 and the end of September 2015. (*Id.* ¶¶ 8–13.) Despite Murphy Paving's alleged confidence that it had timely paid all required wages, union dues, and fringe benefits, when it learned of the grievances, Murphy Paving attempted to negotiate with the District Council and the Funds to resolve the discrepancies revealed by the audit. (*Id.* ¶¶ 7, 10.) In August 2016, after several months of negotiations, the Funds[1] filed a two-count complaint against Murphy Paving in this court to collect the allegedly delinquent employee benefit contributions and union dues. (*Id.* ¶¶ 10, 12.) In October 2016, while this lawsuit was pending, there was a hearing on the wage grievance (the counterclaim does not say who conducted it), and the grievance was upheld in its entirety (presumably a gross error, assuming the truth of Murphy Paving's allegations of full compliance). (*Id.* ¶ 18.) Murphy Paving and the

---

[1] The Funds are allegedly "duly authorized to serve as a collection agent for the Union." (Countercl. ¶ 13.)

District Council ultimately signed a settlement agreement regarding the grievance award in January 2018. (*Id.*)  Also in October 2016, the District Council filed a grievance and a charge with the National Labor Relations Board ("NLRB") alleging that Murphy Paving retaliated against an employee, Raul Luna, for union activity.  (*Id.* ¶¶ 15–16.)  Murphy Paving alleges that the NLRB found no evidence of retaliation (*id.*), but the District Council asserts it withdrew that charge only after Murphy Paving agreed to compensate workers for the alleged retaliation.  (Mot. to Dismiss ("MTD") [96] at 9.)

After a subsequent audit, the District Council filed two additional grievances against Murphy Paving in April 2018, again alleging that Murphy Paving had underpaid wages and fringe benefits.  (*Id.* ¶ 19.)  The District Council filed a complaint with the Illinois Department of Labor related to these grievances, alleging that Murphy Paving failed to comply with Illinois minimum wage and overtime laws, but ultimately dropped the claim.  (*Id.* ¶ 20.)  In one of these April 2018 grievances, the District Council also sought to revoke Murphy Paving's right to rely on the more favorable terms in the Side Letter.  (*Id.*)  Murphy Paving claims that "to appease" the District Council, it agreed to send a "weekly job list" and "reconciliations," and allowed members of the District Council to "observe the various crews and report back."  (*Id.* ¶ 21.)  But on May 31, 2018, the District Council filed a sixth grievance against Murphy Paving for allegedly failing to call a union steward to work.  (*Id.* ¶ 22.)  Murphy Paving alleges that it has attempted to work with the District Council to resolve all of these grievances.  (*Id.* ¶ 23.)

Murphy Paving's counterclaims arise out of communications between the District Council and general contractors for whom Murphy Paving expected to perform subcontractor work on various construction projects.  Count I alleges that the District Council tortiously interfered with two of Murphy Paving's contracts.  First, on some unidentified date, Murphy Paving contracted with Trice Construction Company to perform work as a subcontractor on a gas project.  (*Id.* ¶ 26.)  Then, despite Murphy Paving's alleged compliance with all wage, dues, and benefits terms of the collective-bargaining agreement and the Side Letter, the District Council informed Trice in a letter

3

that Murphy Paving had not paid its workers the correct wages and fringe benefits while they were working on projects covered by Trice's contract with Murphy Paving. (*Id.* ¶ 29.) Specifically, the correspondence stated:

> It has recently come to our attention that employees of Murphy Paving & Sealcoating, Inc. ("Murphy") were not been [*sic*] paid Laborers' wages and fringe benefits while performing work as a subcontractor of Trice Construction. Specifically, employees of Murphy have been miscoded as performing "sealcoating" work and paid as little as $18 per hour, without benefits, while performing asphalt patch work on the Nicor Gas Project during the 2017 construction season through present.

(*Id.*) After receiving this communication, Trice removed Murphy Paving from jobs that Murphy Paving had contracted with Trice to perform, allegedly causing a loss to Murphy Paving of millions of dollars. (*Id.* ¶¶ 30–31.) Murphy Paving had a second contract with Osman Construction Corporation ("Osman"). (*Id.* ¶ 32.) But after the District Council notified Osman on January 30, 2018 that Murphy Paving was "delinquent," Osman informed Murphy Paving that, because Osman was a signatory with the District Council, Osman would "hold funding until notice was received from the union that Murphy was in good standing." (*Id.* ¶¶ 34–35.) It appears that Murphy Paving did ultimately receive the payment, but it alleges it suffered economic losses as a result of the payment delay. (*Id.* ¶ 38.)

In Count II, Murphy Paving alleges that the District Council tortiously interfered with its prospective economic advantage. Specifically, during the period of its dispute with the District Council over wage and fringe benefit payments, Murphy Paving was negotiating with Black Dog Corporation ("Black Dog") to perform paving and maintenance work. (*Id.* ¶ 40.) The negotiations had been going on for some time when the District Council's in-house attorney contacted Black Dog representatives and warned that Black Dog "would be pursued for damages should its venture with Murphy Paving continue." (*Id.* ¶ 43.) Black Dog then ended negotiations with Murphy Paving, as a result of which Murphy Paving lost anticipated revenue. (*Id.* ¶ 46.)

In Count III, Murphy Paving alleges that the District Council tortiously interfered with its economic advantage by giving certain companies that had signed the same collective-bargaining

agreement more favorable Side Letter terms. (*Id.* ¶ 48.) For example, Pavement Systems Inc. was permitted to pay lower hourly wages than Murphy Paving for the same work. (*Id.* ¶ 52.) Because Murphy Paving was bound by less favorable Side Letter terms, it was not "competitive in the marketplace for its services" and lost the opportunity to "acquir[e] certain [unidentified] contracts" with other businesses. (*Id.* ¶ 53.)

The District Council and the Funds now move to dismiss Murphy Paving's counterclaim. *See* FED. R. CIV. P. 12(b)(6). The District Council and the Funds first argue that the Funds must be dismissed as counter-defendants because the counterclaim contains no specific allegations of their wrongdoing. Second, the District Council argues that Murphy Paving's claims are preempted by Section 301 of the LMRA because the court would need to interpret the provisions of the parties' collective-bargaining agreement in order to decide the tortious interference claims. In the alternative, the District Council argues that Murphy Paving's claims are preempted by federal labor law.

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint (or counterclaim) must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. For purposes of this motion to dismiss, the court accepts the well-pleaded factual allegations in the counterclaim as true and draws all reasonable inferences in favor of Murphy Paving. *See Manistee Apartments, LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016). The court may consider the counterclaim, "documents that are attached to the [counterclaim], documents that are central to the [counterclaim] and referred to in it, and information that is properly subject to judicial notice," *Williamson v. Curran*, 714 F.3d 432, 436

(7th Cir. 2013), including matters in the public record. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012); FED. R. EVID. 201(b).

## **DISCUSSION**

The District Council and the Funds argue that Murphy Paving's state-law tortious interference claims must be dismissed because they are preempted either by Section 301 of the LMRA or by other federal labor laws. Section 301 of the LMRA "preempts claims that require interpretation of a collective bargaining agreement." *Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 464 F.3d 651, 657 (7th Cir. 2006). Other federal labor-law principles may also preempt state law, including what is known as *Garmon* preemption, "which forbids state regulation of conduct that is arguably protected or prohibited by federal law." *Id.* (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959)). The District Council and the Funds attach several documents to their motion to dismiss, including collective-bargaining agreements for the years 2013 through the present and the text of the retaliation grievance, but these documents are not central to Murphy Paving's counterclaim, nor are these matters in the public record. *Cf. Williamson*, 714 F.3d at 436. Neither party asks the court to convert this motion to dismiss to a motion for summary judgment, so the court declines to consider the documents attached to the District Council and the Fund's motion to dismiss in ruling on this motion.

### I.     Failure to Adequately Plead Involvement by the Funds

As an initial matter, the court agrees with the District Council and the Funds that Murphy Paving has not sufficiently pleaded wrongdoing on the part of the Funds. Murphy Paving responds that the Funds and the District Council are so inextricably linked that the Funds should not be dismissed as a counter-defendant. Specifically, Murphy Paving contends that the District Council and the Funds have been working in concert throughout this litigation, and directs the court to arguments supporting this position in a separate brief it submitted in support of its partial motion to dismiss the Union and the Fund's complaint. (*See* Murphy Reply in Supp. of Partial Mot. to Dismiss [101].)

6

To survive a Rule 12(b)(6) motion to dismiss, the allegations in a counterclaim must provide sufficient factual detail that a court could "draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Murphy Paving may not rely on arguments made in briefs separate from its pleadings to establish unity of conduct among the counter-defendants; such allegations must be made in the counterclaim itself. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) (noting the "axiomatic rule that a plaintiff may not amend his complaint in his response brief"). And crucially, Murphy Paving's allegations do not establish that the Funds and the District Council are so inextricably linked that the Funds may properly be held liable for wrongdoing that the counterclaim attributes only to the District Council. The sole allegation linking the Funds to the District Council is an allegation in the Funds' own complaint [1] in this action stating that the Funds are authorized collection agents for the District Council. (Countercl. ¶ 13.)

The allegations in Murphy Paving's counterclaim that specifically describe alleged tortious conduct relate to activity of the District Council alone. (*See id.* ¶ 24.) Thus, Murphy Paving states that the *District Council* sent correspondence to Trice that allegedly induced Trice to breach its contract with Murphy Paving, and that Osman received notice from the *District Council* that Murphy Paving was delinquent, allegedly causing Osman to delay payment to Murphy. (*Id.* ¶¶ 29–30, 34–35 (emphasis added).) The counterclaim further alleges that the District Council's in-house lawyer contacted Black Dog and warned that Black Dog would be pursued for damages should it continue to do business with Murphy Paving, but does not suggest that the District Council and the Funds share in-house counsel. (*Id.* ¶¶ 42–43.) Finally, Murphy Paving alleges that the counter-defendants gave "certain other signatories to the CBA more favorable Side Letter terms than those afforded to Murphy Paving." (*Id.* ¶ 48.) The example of a more favorable Side Letter that Murphy attaches to its counterclaim, however, was signed only by the District Council on behalf of affiliated local unions, and the employer, Pavement Systems. (*See* Ex. A to Countercl. at 1.) The Funds are not party to the Side Letter, and the allegations in the

7

counterclaim do not otherwise clarify how the Funds may have been involved with negotiating or executing the side agreements. *See Williamson*, 714 F.3d at 436 (noting that a court deciding a motion to dismiss may consider the complaint and may take judicial notice of "documents that are central to the complaint and referred to in it").

In sum, the counterclaim contains no allegations of wrongdoing by the Funds, either on their own or together with the District Council, and the Funds' status as collection agents for the District Council does not establish that the Funds and the District Council are so inextricably intertwined that the Funds could be liable for the District Council's alleged tortious interference with Murphy's contracts and business expectancy. The Funds are dismissed from Murphy Paving's counterclaim.

## II. Section 301 Preemption of State Law Tortious Interference Claims

Section 301 of the LMRA grants federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). This section governs claims that are "founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective bargaining agreement.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987). This grant of federal jurisdiction has the effect of preempting state-law torts that "'do not exist independently of private agreements,' and that 'purport to define the meaning of the contract relationship.'" *Healy v. Metro. Pier and Exposition Auth.*, 804 F.3d 836, 841 (7th Cir. 2015) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985)). That is, a state law claim is preempted "when it is 'inextricably intertwined with consideration of the terms of the labor contract.'" *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800 (7th Cir. 2013) (quoting *Lueck*, 471 U.S. at 213).

The Supreme Court has clarified that "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Lueck*, 471 U.S. at 211. "[S]tate rules that proscribe

conduct, or establish rights and obligations, independent of a labor contract" are not preempted. *Id.* at 212. If, for example, the claim's sole relationship to a collective-bargaining agreement is that it is "asserted by an individual covered by such an agreement," it is not preempted by § 301. *Williams*, 482 U.S. at 397; *see, e.g., Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 25 n.28 (1983) ("[A] state battery suit growing out of a violent strike would not arise under § 301 simply because the strike may have been a violation of an employer-union contract."). Importantly, "[e]ven if dispute resolution pursuant to a collective bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409–10 (1988) (concluding that a state-law claim of retaliatory discharge was not preempted because determining liability involved "purely factual questions [that] pertain[ ] to the conduct of the employee and the conduct and motivation of the employer" and did not "turn on the meaning of any provision of a collective-bargaining agreement").

A state law claim is, however, preempted by § 301 "when *an element* of the claim 'requires a court to interpret any term of a collective-bargaining agreement.'" *Healy*, 804 F.3d at 841 (quoting *Lingle*, 486 U.S. at 407). The court therefore considers the elements of Murphy Paving's counterclaims. First, in Count I, Murphy Paving alleges that the District Council interfered with its contracts with Trice and Osman. To state such a claim under Illinois law, a plaintiff must demonstrate:

> (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*Healy*, 804 F.3d at 842 (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154–55, 545 N.E.2d 672, 676 (Ill. 1989)).

9

Inducement of a breach is "unjustified" when the defendant has made false statements that cause the plaintiff to lose customers. *See, e.g., Medscript Pharmacy, LLC v. MyScript, LLC*, 77 F. Supp. 3d 788, 796 (N.D. Ill. 2015); *Manley v. Boat/U.S. Inc.*, No. 13 CV 5551, 2014 WL 1647117, at *4–5 (N.D. Ill. Apr. 23, 2014); *see also F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 800–01 (7th Cir. 2007) (quoting *Soderlund Bros. v. Carrier Corp.*, 278 Ill. App. 3d 606, 620, 663 N.E.2d 1, 10 (1st Dist. 1995) ("There is no liability for interference with a prospective contractual relation on the part of one who merely gives truthful information to another.")). The burden is on Murphy Paving to establish that the District Council's statements were false, and therefore the interference unjustified.[2] *Atanus v. Am. Airlines, Inc.*, 403 Ill. App. 3d 549, 587–88, 932 N.E.2d 1044, 1048–49 (1st Dist. 2010). The primary dispute between the parties here concerns whether the District Council's notifications to other employers were justified. Murphy Paving alleges that they were not, and that the District Council falsely informed Trice that Murphy Paving had miscoded and underpaid certain employees, and falsely told Osman that Murphy Paving was "delinquent."

In moving to dismiss these allegations, the District Council argues that Murphy Paving's claims are preempted by Section 301 because verifying the truth of its statements to the general contractors would require the court to interpret the terms of the parties' CBA. The court agrees. While Murphy Paving alleges interference with contracts and business expectancies separate from the CBA, whether the District Council's communications were justified depends, at least in part, on whether Murphy Paving had in fact complied with the CBA. *See Healy*, 804 F.3d at 842 (affirming a finding that a claim of tortious interference with a CBA was preempted because "to

---

[2] Murphy Paving claims as part of its *prima facie* case that the Union's statements were false; this is not a situation in which a counter-defendant attempts to obtain federal jurisdiction over a state claim by asserting § 301 preemption as a defense. *Williams*, 482 U.S. at 398 ("It is true that when a defense to a state claim is based on the terms of a collective-bargaining agreement, the state court will have to interpret that agreement to decide whether the state claim survives. But the presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule.").

determine if [the defendant] tortiously interfered with the CBA, a factfinder would have to determine whether [the employers] did in fact breach the terms of the CBA by terminating Plaintiffs," which would require the court to "review the referral process outlined in Article IV of the CBA"). And whether Murphy Paving complied with the CBA is clearly "substantially dependent on analysis of a [CBA]." *Williams*, 482 U.S. at 394.

True, courts distinguish between state-law claims that require interpretation of a CBA, which are preempted, and those that merely require reference to the terms of a CBA, which are not. *See In re Bentz Metal Prods. Co., Inc.*, 253 F.3d 283, 289 (7th Cir. 2001) ("[T]he overriding principle is that for preemption to apply, *interpretation* of the CBA and not simply a reference to it is required."). For example, in a bankruptcy case involving the priority of employees' liens for vacation pay owed under the terms of a CBA, the Seventh Circuit reversed the district court's finding that the claim was preempted by Section 301 of the LMRA despite the fact that "the employees' rights to the monies due, and the precise amount, depend on the collective bargaining agreement." *Id.* at 287. The court noted that neither the entitlement nor the amount due were seriously in dispute; if they were, "the CBA would control," and "almost certainly, interpretation of the agreement would be necessary and would be subject to the arbitration procedures in the contract." *Id.* at 289.

In this case, the parties may have no dispute concerning the meaning of the CBA's terms—for example, what it means to perform sealcoating rather than asphalt patch work, or how to determine the correct wage and benefit rates. It appears that there is a dispute, however, about whether Murphy Paving's actual payments were equivalent to its contractually-required payments. If the only question were the amount of money that Murphy Paving owed to certain employees, the court perhaps could reference the CBA without interpreting it. *See Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994) ("[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."); *see also Lingle*, 486

U.S. at 413 n.12 ("A collective-bargaining agreement may, of course, contain information such as rate of pay . . . that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled."). But the parties dispute whether Murphy Paving complied with the terms of the CBA and the Side Letter—Murphy Paving alleges that the District Council interfered with its contracts despite its compliance with all wage, fringe benefits, and union dues provisions of the agreements. To resolve this dispute, the court would have to determine, for example, whether the work completed by individual employees was correctly coded, and how much in wages, fringe benefits, and union dues Murphy Paving was obligated to pay under the governing contract. That is, the CBA controls, and the court would have to interpret the agreement to determine the District Council's liability on the claim of tortious interference with contracts.

In Count II, Murphy Paving alleges that the District Council tortiously interfered with its expectation of entering a contract with Black Dog to perform paving and maintenance work when the District Council's in-house counsel told Black Dog that it would be pursued for damages if it continued to work with Murphy. (Countercl. ¶ 43.) Murphy Paving appears to allege that the District Counsel's assertion that Murphy Paving owed damages, and therefore that Black Dog could also potentially be liable, was false. To state a claim for tortious interference with prospective economic advantage, a plaintiff must show:

> (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference.

*Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (quoting *Voyles v. Sandia Mortg. Corp.*, 196 Ill. 2d 288, 296, 751 N.E.2d 1126, 1133 (Ill. 2001)). Determining whether the District Council's communication to Black Dog was justified will, again, likely depend on an interpretation of the CBA. (*See* MTD at 7; MTD Reply [112] at 3.) Neither party explains whether any provisions of the CBA govern a general contractor's liability for doing business with a non-compliant subcontractor, but importantly, whether the District Council's statements to Black

Dog were true depends on whether Murphy Paving in fact complied with the CBA—an inquiry that almost certainly requires interpreting the agreement. Moreover, as discussed more fully below, *see* Section III, *infra*, Count II appears to be subject to *Garmon* preemption, as well.

The court is persuaded that Count III is also preempted by Section 301 of the LMRA. In Count III, Murphy Paving alleges that the District Council gave "certain other signatories to the CBA more favorable Side Letter terms than those afforded to Murphy Paving," which hindered Murphy's ability to compete for contracts. (Countercl. ¶¶ 48, 53.) Resolving this claim necessarily requires interpretation of the Side Letters, which are part of the CBA, to determine if Murphy Paving's is less favorable. In its response brief, Murphy argues that "[i]n reality, this means that certain other signatories were allowed to pay their employees lower wages." (Def.'s Resp. to MTD ("MTD Resp.") [103] ¶ 13.) It is true that comparing wage rates does not necessarily require the court to interpret the meaning of any term of the CBA, but it is also true that a party may not amend its pleading in a response brief. *See Pirelli Armstrong*, 631 F.3d at 448. And whether other CBA signatories had Side Letters with more favorable "terms" is more of an interpretive undertaking than merely comparing wage rates. (*See* Countercl. ¶ 50.) For example, more favorable wage rates could be offset by less favorable fringe benefits. This claim is "inextricably intertwined with consideration of the terms of the labor contract," *Crosby*, 725 F.3d at 800, and therefore preempted.

"[A] peculiarity of section 301, as it has been interpreted by the courts, is that any claim within its scope, even if denominated as a state law claim, is deemed to arise under, and only under, section 301, that is, under federal law." *Kimbro*, 215 F.3d at 724 (citing cases). But "§ 301 does not create tort rights." *Healy*, 804 F.3d at 844 (citing *Brazinski v. Amoco Petroleum Additives Co.*, 6. F3d 1176, 1180 (7th Cir. 1993) ("The common law to be made is a common law of contracts, not a source of independent rights, let alone tort rights; for section 301 is . . . a grant of jurisdiction only to enforce contracts.")); *see also Kimbro*, 215 F.3d at 726–27. Because the court finds that Counts I and III of Murphy Paving's counterclaim for tortious interference against the

District Council are preempted by § 301, and § 301 creates no tort cause of action, these Counts of Murphy Paving's counterclaim are dismissed.

## III. *Garmon* Preemption

The District Council argues for dismissal on the basis of *Garmon* preemption, as well. *See Garmon*, 359 U.S. at 242–43. The court agrees that the doctrine of Garmon preemption requires dismissal of Count II. *Garmon* preemption is motivated by an interest in uniform application and interpretation of federal labor law. If a state-law cause of action purports to regulate activities that are clearly protected by Section 7 of the National Labor Relations Act ("NLRA") or clearly prohibited as an unfair labor practice by Section 8, "state jurisdiction must yield." *Id.* at 244. Additionally, when it is not "clear whether the particular activity regulated by the States [is] governed by § 7 or § 8, . . . these determinations [must] be left in the first instance to the National Labor Relations Board." *Id.* at 244–45. That is, "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Id.* at 245.

The party claiming preemption carries "the burden of showing at least an arguable case before the jurisdiction of a state court will be ousted." *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 396 (1986). An activity is "arguably" governed by the NLRA when the party claiming preemption "demonstrate[s] that his case is one that the Board could legally decide in his favor." *Id.* at 395. "That is, a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board." *Id.*

The District Council argues that its communication with Black Dog is either arguably protected by Section 7 of the NLRA or arguably prohibited by Section 8 as an unfair labor practice. Specifically, the District Council states that "seeking enforcement of a right collectively bargained for" is conduct protected by Section 7, 29 U.S.C. § 157, and the District Council's communication

14

with the general contractor addressed the violation of Murphy Paving's employees' right under the CBA to certain wages and fringe benefits. (MTD Resp. at 4–5.) In the alternative, the District Council argues that its communication with Black Dog might be deemed a secondary boycott arguably prohibited Section 8(4)(ii)(B) of the LMRA, which makes it an unfair labor practice for

> a labor organization or its agents to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . .

29 U.S.C. § 158(b)(4)(ii)(B). The purpose of this provision is to protect neutral parties against coercive secondary boycotts by a union. *See 520 S. Michigan Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708, 719 (7th Cir. 2014).

Claims of tortious interference with contract or business expectancy are often preempted by federal labor law as involving unfair labor practices, including § 8 violations. *See, e.g., Reinke*, 464 F.3d at 657; *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240–41 (7th Cir. 1996); *Park Elec. Co. v. Int'l Bhd. of Elec. Workers, Local 701, AFL-CIO*, 540 F. Supp. 779, 782 (N.D. Ill. 1982) ("It has become well established that state remedies for business-related torts are generally preempted by federal law, since most such claims are based on conduct capable of being characterized as unfair labor practices under § 8 of the N.L.R.A."). There are two components of a Section 8(b) unfair labor practice claim. The first focuses on the conduct of a labor organization in threatening, coercing, or restraining another person, and the second focuses on the purpose of that conduct—to force or require a person to cease doing business with another. 29 U.S.C. § 158(b)(4)(ii)(B). Thus, peaceful persuasion is permitted, but threatening and coercive conduct is not. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 569, 578 (1988) (explaining that the words "threats, coercion, or restraints" are "nonspecific, indeed vague" and that they should be interpreted with "caution" rather than being giving a "broad sweep").

15

Whether the District Council's conduct was coercive or threatening depends on the facts and circumstances of the communications—a matter uniquely within the purview of the NLRB. For example, the NLRB has held that a union's insinuation that there would be "trouble" or "problems" unless a neutral party ended business relations with another, did not violate Section 8 without being accompanied by more coercive activities like picketing. *See, e.g., Champion Exposition*, 292 N.L.R.B. 794, 795 (1989); *Carpenters Dist. Council (Apollo Dry Wall)*, 211 N.L.R.B. 291, 295 (1974). Nor is announcing a labor dispute, even using a large banner, considered coercive. *See, e.g., United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 355 N.L.R.B. 797, 806–07 (2010); *see also 520 S. Michigan Ave.*, 760 F.3d at 715, 728 (affirming that phone calls from supporters of a union during a labor dispute with a hotel employer to a neutral party that led to the neutral party cancelling its arrangement with the hotel to rent meeting space were persuasive but not coercive). In *Ashford TRS Nickel*, the union and its members, employees of a hotel, notified potential hotel customers of the union's labor dispute with the hotel and of the prospect of picketing at the hotel, but made no threats of violence; the NLRB concluded this activity was protected by Section 7. *See Ashford TRS Nickel, LLC*, 366 N.L.R.B. No. 6, at *7, 2018–19 NLRB Dec. ¶ 16,382 (Feb. 1, 2018). The union also requested that customers not patronize the hotel due to the labor dispute. On the other hand, the NLRB in *Apollo Dry Wall* found a § 8(b)(4)(ii)(B) violation where a "union agent informed a neutral employer that the union would use 'economic pressure' if the neutral employer did business with the concern disfavored by the union." *Apollo Dry Wall*, 211 N.L.R.B. at 295.

In this case, Murphy Paving alleges that the District Council attempted to get Murphy Paving to pay the wage, fringe benefit, and union dues by exerting pressure on general contractors that dealt with Murphy Paving. The District Council's communication to Black Dog could be viewed as merely informing the general contractor of the District Council's labor dispute with Murphy Paving, *see United Mine Workers, Dist. 12*, 239 N.L.R.B. 800, 801–03 (1978), but the communication may also "indicate[ ] an intent not to persuade, but simply to interfere," which

16

may be impermissibly coercive. *520 S. Michigan Ave.*, 760 F.3d at 722. In short, the District Council's alleged threat to pursue Black Dog should it do business with Murphy Paving may be characterized as an unfair labor practice in violation of Section 8 of the NLRA. Count II of Murphy Paving's counterclaim is subject to *Garmon* preemption.

## **CONCLUSION**

In its counterclaim, Murphy Paving alleges no conduct attributable to the Funds that supports liability for tortious conduct. Counts I and III of Murphy Paving's counterclaim are preempted by Section 301 of the LMRA, and Count II is *Garmon* preempted because it alleges conduct by the District Council that arguably amounts to an unfair labor practice. Accordingly, the District Council and the Fund's motion to dismiss [96] Murphy Paving's counterclaim is granted.

ENTER:

Date: March 30, 2020

_____
REBECCA R. PALLMEYER
United States District Judge